UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

ROBYN R. WYNSTRA,                    )
                                     )
              Plaintiff              )
                                     )
       v.                            )    CAUSE NO: 2:11 cv 437
                                     )
MICHAEL J. ASTRUE, Commissioner      )
of Social Security,                  )
                                     )
              Defendant              )

OPINION AND ORDER

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the claimant, Robyn R. Wynstra, on November 1, 2011. For the reasons set forth below, the decision of the Commissioner is **AFFIRMED**.

Background

The claimant, Robyn R. Wynstra, applied for Disability Insurance Benefits and Supplemental Security Income on May 8, 2007, alleging a disability onset date of October 25, 2005. (Tr. 143) Her claims initially were denied on August 24, 2007, and again upon reconsideration on January 14, 2008. (Tr. 72-86) Wynstra requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 94) A hearing before ALJ Steven J. Neary was held on February 26, 2010, at which Wynstra testified along with her neighbor, Cindy Lantz, and vocational expert, Leonard M. Fisher. (Tr. 32-52)

On March 23, 2010, the ALJ issued his decision denying Wynstra benefits. (Tr. 25)  The ALJ found that Wynstra was not under a disability within the meaning of the Social Security Act from October 25, 2005, through the issue date of his decision. (Tr. 25) After granting Wynstra's request for more time, the Appeals Council denied her request for review on October 5, 2011. (Tr. 1, 7) Wynstra filed her timely complaint with this court on November 1, 2011.

Wynstra was born on June 11, 1979, making her 31 years old on the date of the ALJ's decision. (Tr. 60)  She is 5'10" tall and weighs approximately 149 pounds. (Tr. 35) Wynstra separated from her husband in 2005, but at the time of the ALJ's decision, she resided with him along with their two minor children. (Tr. 35, 40) Wynstra graduated from high school but had been placed in special educational classes throughout her elementary and high school years. (Tr. 305)

Wynstra was employed last at Subway in October 2005, where she opened the store and prepared sandwiches.  She held this position for approximately three to four months. (Tr. 35) Prior to that time she worked at a different Subway restaurant in Salem, Indiana, for approximately six months. (Tr. 36) In the two years prior to working for Subway, Wynstra was employed as a certified nursing assistant until she resigned in 2001.  (Tr. 36)

2

Wynstra's diagnoses include old bilateral wrist fractures; old left foot fracture with tarsometatarsal joint arthritis; eschemia of left foot; small blood vessel disease with poor skin perfusion in feet bilaterally; traumatic arthritis secondary to an old right foot fracture; partial arthrodesis of right foot and possible tarsal coalition of the right ankle; Raynaud's syndrome; Leukocytosis; progressive weight loss; asthma and seasonal allergies; mood disorder (NOS); chronic attention deficit disorder; attention deficit hyperactivity disorder; learning disabilities; depression; major depressive disorder (recurrent, moderate); and borderline personality disorder. (Tr. 298, 301-304, 307, 319, 324, 356, 362, 457, 472, 498, 501, 537)

Wynstra was involved in three motor vehicle accidents in 1995, 1997, and 2000.  The combined injuries from those accidents included compound fractures to both of her wrists, bilateral foot and ankle injuries, and a fractured jaw.  (Tr. 301-303, 417, 473) Additionally, Wynstra's medical records showed a history of a stroke and coma after the 1997 accident. (Tr. 287)

On January 17, 2005, Wynstra saw Dr. Perry Zack, D.O. with pain in both her wrists and ankles.  Upon examination, Dr. Zack made a diagnosis of joint pain and progressive weight loss.  (Tr. 454) Upon finding a fatty tumor in the right breast, Dr. Zack referred Wynstra to Dr. Virginia T. Tabib, M.D., at Cancer Health Treatment Centers. (Tr. 454, 457) On March 8, 2005, Dr. Tabib

3

examined Wynstra and provided diagnoses of Leukocytosis, progressive weight loss, and lumps in the right breast.  (Tr. 457-58) Dr. Tabib found Wynstra had "weakness in all extremities," possibly as a result of prior surgeries, and noted that Wynstra might be bulimic. (Tr. 458, 459)

On November 24, 2005, Wynstra was seen in the Emergency Room at Porter Memorial Hospital for complaints of numbness in her left hand extending to her mid forearm and an inability to move her fingers. (Tr. 354) An x-ray of her left wrist revealed an old fracture with an ununited radial fragment.  No recent fractures were noted.  (Tr. 362)  She was prescribed Vicodin, given a splint, and released.  (Tr. 357-58)

In May 2006, Wynstra saw a surgeon, Dr. Weldon J. Cooke, M.S., F.A.C.S. Dr. Cooke ordered x-rays of Wynstra's right wrist, left foot, and right ankle.  (Tr. 301-303)  His findings confirmed an old fracture of the distal radius in her right wrist; an old injury to the left foot with considerable degeneration in the mid-portion of the tarsometatarsal area and partial arthrodesis; and in the right ankle, evidence of traumatic arthritis. (Tr. 301-303) Dr. Cooke discussed cortisone injections as a possible treatment for arthritis in both her hands and feet and referred her to a Dr. Magill. (Tr. 298, 299) The record shows that Wynstra failed to follow up on Dr. Cooke's referral. (Tr. 298)

4

On August 23, 2006, and upon referral by the Disability Determination Office of the Social Security Department of the State of Indiana (State Agency), Wynstra underwent a Mental Status Evaluation conducted by Dr. Gary M. Durak, Ph.D. (Tr. 304) Dr. Durak noted that a 1996 consultative examination rated Wynstra's Global Assessment of Functioning (GAF) at 60, indicating moderate symptoms. Upon examination, Dr. Durak found Wynstra to be oriented in all spheres with thought processes and thought content within normal limits. (Tr. 305)  However, her motor activity was restless, her eye contact was poor, and her "mood and affect reflected depression and anxiety."  Additionally, Wynstra demonstrated some distractibility and had some memory problems.  (Tr. 305)  Dr. Durak diagnosed Wynstra with mood disorder (NOD), attention deficit hyperactivity disorder, and learning disabilities.  He found Wynstra's psychosocial and environmental problems relevant to her illness to be severe and assigned a GAF of 45-50. (Tr. 307)

The State Agency additionally referred Wynstra to Dr. Ralph E. Inabnit for an evaluation on August 28, 2006.  Dr. Inabnit noted that Wynstra could drive a car, pick up a coin, write a letter, and do housework, laundry, and shopping.  (Tr. 308) Upon examination, Dr. Inabnit observed that Wynstra was ambulatory without the use of a walker or cane, but he noted "painful extremity" in his musculoskeletal systems evaluation. (Tr. 308,

310) Direct strength testing revealed no noted weaknesses in the extremities, however motor strength and grip strength were diminished (4/5) in both the upper and lower extremities. (Tr. 319) Dr. Inabnit concluded in his report that there was evidence of pain in Wynstra's right ankle and foot; asthma; bronchospasm; tarsal metatarsal arthritic joint of the third ray of the right foot; and partial arthrodesis of the right foot. He also commented that Wynstra "has a lot of pain." (Tr. 319)

On September 12, 2006, at the request of the State Agency, Wynstra was evaluated by Dr. Giselle Thomalla, Ph.D., of Associated Psychological Services. (Tr. 321) Dr. Thomalla reported that Wynstra's IQ scores showed functioning at the borderline range (FSIQ = 70; VIQ = 71; and, PIQ = 74). (Tr. 323) Dr. Thomalla noted Wynstra's assertion that she had not been able to afford treatment within the past three or four years and offered the following diagnoses: Major Depressive Disorder (recurrent, moderate); Attention-Deficit/Hyperactivity Disorder (predominately inattentive type); learning disorders; and Borderline Personality Disorders. Dr. Thomalla assigned Wynstra a GAF of 50. (Tr. 324)

On September 20, 2006, non-examining state reviewer, Dr. Kenneth Neville, Ph.D., completed a Mental RFC Assessment of Wynstra in which he concluded that she was not significantly limited in most areas but that she was moderately limited in the

following areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; and, the ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 325-342) Dr. Neville assessed that Wynstra was capable of simple repetitive tasks. (Tr. 341)

On October 30, 2006, non-examining state consultant, Dr. M. Brill, M.D., completed a physical RFC Assessment of Wynstra. Dr. Brill concluded that Wynstra retained the functional capacity to lift or carry 10 pounds frequently and 20 pounds occasionally, was unlimited in her ability to push and pull, and could sit, stand, or walk six hours in an eight hour workday. (Tr. 369-371) Wynstra should refrain from climbing ladders, ropes, or scaffolds, only climb ramps and stairs occasionally, and could frequently balance, stoop, kneel, crouch, and crawl. (Tr. 369-371) Dr. Brill's assessment determined that Wynstra had no manipulative, visual, or communicative limitations but that she should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 372, 373)

On or about June 2, 2007, Wynstra fell face first off of a pickup truck, and on June 4, 2007, CT images were taken of Wynstra's head along with x-rays of her left knee. (Tr. 486-488) The CT scan showed mucosal thickening in the right maxillary

sinus consistent with sinus disease but was otherwise normal.
(Tr. 488) The x-ray showed a normal left knee.  (Tr. 486)

On June 17, 2007, psychologist Joyce Scully evaluated
Wynstra noting that she claimed that she barely could support
herself financially, and although she suffered from depression,
ADHD, and anxiety, she refused to see a psychologist because she
"does not trust anybody."  (Tr. 404) Dr. Scully noted that
Wynstra gave unusual responses and opined that she was either
self-medicating or her prescribed medications were affecting her
severely.  (Tr. 403).  Dr. Scully reported that Wynstra's memory
scores were between low average and borderline, but when broken
down to verbal memory versus visual memory, her verbal delayed
memory was in the below average to far below average range and
visual memory for remembering details and manipulation was either
below average or far below average.  (Tr. 405)  Dr. Scully's
diagnoses included dysthymia and significant memory deficits, and
she assigned a GAF of 75/70 in accordance with Wynstra's self-
reported abilities. (Tr. 406)

On July 2, 2007, Dr. Inabnit consulted with Wynstra for a
second time. (Tr. 408)  His report indicated that Wynstra's motor
strength remained at 4/5 in all extremities and grip strength
remained reduced at 4/5 bilaterally. (Tr. 413-415) Wynstra
maintained her previous complaints of pain in her wrists, feet,
and knees, with progressively worsening pain in her lower extrem-

ities.  (Tr. 408) Dr. Inabnit noted decreased range of motion in
her right ankle but otherwise indicated no real change in clini-
cal findings from his previous report.  (Tr. 414)

On July 3, 2007, non-examining state reviewer Dr. F. Klad-
der, Ph.D., completed a Mental RFC Assessment which showed
Wynstra to be slightly more limited than the findings of Dr.
Neville in 2006.  (Tr. 420-436) Dr. Kladder concluded that
Wynstra was not significantly limited in most areas, but he found
that she was moderately limited in the following areas: the
ability to understand and remember detailed instructions; the
ability to carry out detailed instructions; the ability to main-
tain attention and concentration for extended periods; and the
ability to complete a normal workday and workweek without inter-
ruptions from psychologically based symptoms and to perform at a
consistent pace without an unreasonable number and length of rest
periods. (Tr. 434-435) In rating her functional limitations, Dr.
Kladder reported that Wynstra had mild restrictions in activities
of daily living; mild difficulties in maintaining social func-
tioning; and marked difficulties in maintaining concentration,
persistence, or pace. (Tr. 430) Finally, Dr. Kladder translated
his findings into a functional capacity assessment which con-
cluded that Wynstra had no problems socially and could perform
simple repetitive tasks so long as they were presented one at a
time. (Tr. 436)

9

Progress notes and lab reports from the chart of Wynstra's internist, Dr. John Kelly, M.D., covered the period from April, 2007 to November, 2008. (Tr. 460-490) Dr. Kelly's records indicated diagnoses of bipolar disorder, chronic adult ADD, and chronic TMJ. (Tr. 462, 475-477) On May 29, 2008, Dr. Anne Hollingsworth, D.O., noted that Wynstra's chronic ADD was "stable on current medications." (Tr. 472) In September 2006, Dr. Kelly recorded Wynstra's dramatic weight loss of 140 pounds over 10 months and complaints of being cold all the time with shaking and weakness. (Tr. 481) He also noted her inability to afford treatment. (Tr. 466) In March 2007, Dr. Kelly indicated difficulties with memory and concentration and noted that Wynstra was anxious, depressed, paranoid, and easily irritated. (Tr. 546, 547) Dr. Kelly further noted that Wynstra could not stand, sit, or lift due to severe pain in her feet, lower back, and neck. (Tr. 547)

On March 23, 2007, Dr. Kelly completed a Medical Source Statement (MSS) form on Wynstra's physical ability to do work-related activities. Dr. Kelly checked "yes" for all limitations and impairments including limitations on seeing, hearing, and speaking. (Tr. 556-559) Under each section, Dr. Kelly noted that Wynstra "cannot function in a job situation" and that "there is no cure for her incapacity" with no further explanation. On the same date, Dr. Kelly completed a separate MSS on mental limita-

10

tions indicating extreme limitations in all areas.  In support of
these findings, Dr. Kelly noted that Wynstra was not able to
"remember 2 of 3 simple things."  (Tr. 560)

On December 23, 2008, Wynstra was admitted to Saint An-
thony's Hospital after presenting to Dr. Hollingsworth with pain
in both feet, which were blue and numb.  At that time, she also
complained of recent pain in her wrists and hands, bilaterally,
and pain in her right ankle. (Tr. 495) Tests showed small vessel
disease, most likely from smoking and borderline diabetes.  (Tr.
498) Wynstra ultimately was diagnosed with Raynaud's phenomenon,
likely related to smoking and exposure to cold.  (Tr. 496, 498)
She was advised to discontinue tobacco use, all stimulants and
decongestants, and to keep her feet warm. (Tr. 495).

On March 3, 2009, Wynstra was evaluated at the Swanson
Center for depression, low self-esteem, fearfulness, loss of
interest, sleep impairment, and alcohol abuse.  (Tr. 570) David
Johnson, LCSW, assessed Wynstra's clinical disorders as primarily
manic/depressive psychosis with secondary alcohol abuse/unspeci-
fied and assigned a GAF score of 45.  (Tr. 587)

On May 29, 2009, Johnson reviewed his assessment of Wynstra
with essentially no changes.  This re-assessment by Johnson was
endorsed by Dr. Sajja L. Babu, M.D., on June 4, 2009. (Tr. 646-
47)

11

On January 19, 2010, Johnson completed an Medical Source Statement regarding Wynstra's mental ability to perform work-related activities which described her impairments as affecting her ability to understand, remember, and carry out instructions. (Tr. 636) Johnson commented that Wynstra's depression slightly restricted her ability to understand, remember, and carry out short simple instructions; and moderately restricted both her ability to understand, remember, carry out detailed instructions, and make judgments on simple work-related decisions.  (Tr. 636) Johnson further assessed that Wynstra was restricted moderately in her ability to interact appropriately with her co-workers, supervisors, and the public, as well as her ability to respond appropriately to work pressures and changes in a routine work setting. (Tr. 637) Johnson further commented that Wynstra's fatigue from poor sleep affected her capability to show up for work on time and attend regularly.  (Tr. 637)

At the hearing before the ALJ, Wynstra testified that she could not have worked two years prior to the hearing date because of anxiety and pain in her hands and feet. (Tr. 37) She also said that her condition had changed significantly over the last couple of years in that she was functioning worse at the time of the hearing than two years prior.  (Tr. 37) Despite taking 750mg of Hydrocodone three times a day, Wynstra continued to experience a "repeated stabbing" pain "tearing [her] arm off or [her] foot

12

off." (Tr. 38) She experienced tiredness from the pain medica-
tions, and at times, she felt relief followed by a sudden return
of severe pain while she was standing, sitting, or walking. (Tr.
38)

Wynstra testified that because of intense pain in both of
her feet, she could walk only a few feet; stand for approximately
20 minutes; and sit and work for 15 minutes, maximum. (Tr. 38-39)
Her pain was greater in the right foot because she has "no ankle
there." (Tr. 38) Wynstra explained that she had shattered both of
her wrists and had no circulation in her hands because of the
Raynaud's syndrome. (Tr. 38) Raynaud's syndrome caused her hands
to cramp and burn, sting, go numb, and turn black. (Tr. 43) She
could not tolerate cold temperatures and could not use buttons,
open a jar, or lift more than a pound or two comfortably. (Tr.
38, 43)

Wynstra further testified that she spent her days attending
doctors appointments, laying down, watching television, and
sleeping. (Tr. 40)  She could dress and bathe herself and could
do some housework and cooking, but she had to sit down a lot.
(Tr. 40) She needed to elevate her feet or they would swell "to
the size of a basketball." (Tr. 46)  She had no hobbies or
interests and could drive only a very short distance.  (Tr. 40)

Finally, Wynstra testified that she had been receiving
counseling and treatment for alcoholism and had not had a drink

in almost a year. (Tr. 41) She was seeing a psychologist for depression and had anxiety or panic attacks when she was around people that she did not know. (Tr. 42, 44)

Next, Wynstra's neighbor and friend, Cynthia Lance, testified that she had known Wynstra for about three years and that Wynstra's condition had worsened over those years. (Tr. 47) Lance stated that she went to Wynstra's house to help her at least twice a week. Lance helped Wynstra clean and do laundry and sometimes assisted Wynstra to get into or up from a seated position. (Tr. 47) Lance corroborated Wynstra's testimony regarding the frequency with which she must sit or lie down. (Tr. 48)

Vocational Expert ("VE") Dr. Leonard Fisher was the last to testify at the hearing before the ALJ. (Tr. 49) Before testifying, the VE affirmed that he had reviewed the records in the file relative to Wynstra's past employment and had prepared a document summarizing her past work history. (Tr. 49) After the VE verified that his submitted resume was complete and current and no objections were made, the ALJ posed a series of hypothetical questions. (Tr. 49-51) First, the ALJ asked whether a person of Wynstra's age, education, and work history, who was limited to working at the sedentary exertion level, limited to occupations which did not require concentrated exposure to extremes of temperatures, wetness, humidity, smoke, fumes, dust, and chemicals, and could not engage in detailed or complex tasks, but

14

could engage in simple repetitive tasks, could perform any of Wynstra's past work.  The VE responded in the negative. (Tr. 49)

The ALJ next asked if there were any jobs that could be performed by a person with such limitations as described in his first hypothetical.  The VE indicated that a person with such limitations could perform work as a surveillance system monitor (100 jobs in the region, 1,200 in the state, and 20,000 nation- ally), a call or phone operator (less than 100 jobs in the region, 700 in the state, and 20,000 to 25,000 nationally), and an order clerk, food and beverage (200 to 300 jobs in the region, 2,000 to 3,000 in the state, and 10,000 to 20,000 nationally). (Tr. 50)

Finally, the ALJ asked the VE if an individual of the same age, education, and work experience as Wynstra that had limita- tions consistent with Wynstra's testimony would be capable of performing any of Wynstra's past work, or any other job that existed in significant numbers, to which the VE replied, "No and no." (Tr. 50)

Wynstra's attorney asked the VE to assume that Wynstra had marked limitations in maintaining concentration, persistence, and pace. (Tr. 50-51) The VE responded by stating, "if you mean by marked she couldn't do simple routine tasks then she couldn't do those jobs I indicated." (Tr. 51)

15

In his decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled. (Tr. 17-18) At step one, the ALJ determined that Wynstra had not engaged in substantial gainful activity since the alleged onset date of October 25, 2005. (Tr. 18) At step two, the ALJ found that Wynstra had the following severe impairments: old bilateral wrist fractures; old right ankle fracture with possible tarsal coalition of the right ankle; diagnosis of Raynaud's syndrome in December, 2007; asthma and seasonal allergies; long history of tobacco abuse; reported history of ADHD; borderline intellectual functioning with significant memory deficits; and mood disorder, NOS. (Tr. 18)

At step three, the ALJ found that Wynstra's impairments, or combination thereof, did not meet or medically equal any of the listed impairments. (Tr. 21) Specifically, the ALJ noted that the medical evidence did not show that Wynstra met the criteria necessary to meet or medically equal listing 1.02 (Major dysfunction of a joint(s) due to any cause), or Mental Disorder Listings 12.02 or 12.04. (Tr. 21, 22)  In making this determination, the ALJ explained that Wynstra did not meet the required level of severity for the listings considered because neither the "Paragraph B" or "Paragraph C" requirements were satisfied as necessary. (Tr. 22)

To satisfy the "Paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction on activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Tr. 22) The ALJ adopted the assessment of the state agency physicians and found that the record supported only mild restrictions in Wynstra's activities of daily living and social functioning.  Although the ALJ agreed that Wynstra showed marked deficiencies in concentration, persistence, and pace, such an impairment alone was not enough to satisfy the required "Paragraph B" criteria of the listings.  The ALJ further explained that the evidence failed to establish the presence of the "Paragraph C" criteria which required medically documented history of specific diagnoses, duration, and symptoms. (Tr. 22)

The ALJ found that Wynstra had the capacity to perform sedentary work as defined in 20 C.F.R. §404.1567(a), except that she must avoid concentrated exposure to extremes of temperature, wetness, humidity, smokes, fumes, odors, gasses, dust, and chemicals.  He also found she was unable to perform more than simple, repetitive tasks. (Tr. 22) In determining Wynstra's residual functional capacity (RFC), the ALJ essentially adopted the RFC of State Agency consultant, Dr. Kladder, "for all the

reasons [he] state[d]."  (Tr. 22) The ALJ confirmed that, in
determining the RFC he considered the entire record, all of
Wynstra's symptoms, and the extent to which Wynstra's symptoms
reasonably could be accepted as consistent with the objective
medical evidence and other evidence. (Tr. 22)

In reaching his RFC determination, the ALJ considered
Wynstra's testimony and stated that the medical records did not
"corroborate the extreme limits to which she testified."  (Tr.
23) The ALJ concluded that Wynstra's medically determinable
impairments reasonably could be expected to cause the symptoms
she alleged; however, the statements by Wynstra and her neighbor
concerning the intensity, persistence, and limiting effects of
her symptoms were not credible to the extent they were inconsis-
tent with the ALJ's residual functional capacity assessment. (Tr.
23) The ALJ reasoned that the assessment by the Swanson Center
Social Worker, David Johnson, did not rate any behavioral area
higher than a 2 and that this was consistent with the State
Agency's assessment that Wynstra could perform simple repetitive
tasks.  (Tr. 23-26)  The ALJ summarized that his RFC was "sup-
ported by the objective medical findings, treatment history, and
range of daily living activities." (Tr. 24)

The ALJ gave little or no weight to the opinion of Wynstra's
treating physician, Dr. Kelly, stating that his opinion was

18

"incredible on its face" and "not corroborated by his own records or those of any other treating source." (Tr. 23, 24)

With the RFC determined, at step four the ALJ concluded that Wynstra was unable to perform any past relevant work.  (Tr. 24) At step five, the ALJ found that considering Wynstra's age, education, work experience and RFC, there were a significant number of jobs available in the national economy that she could perform including surveillance system monitor, order clerk/food and beverage, and call out operator. (Tr. 25)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Secu-rity Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Sub-stantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852 (1972) (*quoting* *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v.*

19

*Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368—69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability insurance benefits and Supplemental Security Income are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. §404.1520, §416.920. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §404.1520(b), §416.920(b). If she is, the claimant is not disabled and the evaluation process is over, If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which

20

"significantly limits . . . physical or mental ability to do
basic work activities." 20 C.F.R. §404.1520(c), §416.920(c).
Third, the ALJ determines whether that severe impairment meets
any of the impairments listed in the regulations. 20 C.F.R.
§401, pt. 404, subpt. P, app. 1. If it does, then the impairment
is acknowledged by the Commissioner to be conclusively disabling.
However, if the impairment does not so limit the claimant's
remaining capabilities, the ALJ reviews the claimant's "residual
functional capacity" and the physical and mental demands of her
past work. If, at this fourth step, the claimant can perform her
past relevant work, she will be found not disabled. 20 C.F.R.
§404.1520(e), §416.920(e). However, if the claimant shows that
her impairment is so severe that she is unable to engage in her
past relevant work, then the burden of proof shifts to the Com-
missioner to establish that the claimant, in light of her age,
education, job experience and functional capacity to work, is
capable of performing other work and that such work exists in the
national economy. 42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f),
§416.920(f).

Wynstra raises several challenges to the ALJ's opinion.
First she asserts that the hypothetical questions posed to the VE
failed to set out all of her impairments. Next, she contends that
the ALJ's failure to give controlling weight to the opinions of
the treating psychiatrist and physician was unsupported by and

21

contrary to the evidence of record. Finally, she complains that the ALJ erred in his credibility determination of both herself and the neighbor who testified on her behalf.

Wynstra first attacks the form of the hypothetical question posed to the VE, alleging that the ALJ erred by providing an improper hypothetical that failed to set out all of her impairments. Specifically, Wynstra contends that because the ALJ found that Wynstra had "marked difficulties with concentration, persistence, and pace," he should have included that limitation explicitly in his hypothetical to the VE.

When an ALJ presents a hypothetical to a VE, it ordinarily "must include all limitations supported by medical evidence in the record," including limitations imposed by depression. *Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir. 2009)(*citing Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002)); *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). The Seventh Circuit has specified that an ALJ's hypothetical question to the VE must "account for documented limitations of 'concentration, persistence or pace.'" *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009)(citations omitted).

Wynstra relies on *Stewart v. Astrue*, 561 F.3d 679 (7th Cir. 2009), and *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 621 (7th Cir. 2010), to support her argument.  In *Stewart*, the Seventh

22

Circuit rejected the Commissioner's argument that the ALJ accounted for the claimant's mental impairments by restricting the hypothetical to the VE to simple routine tasks. *Stewart*, 561 F.3d at 684-85. In *O'Connor-Spinner*, the Seventh Circuit reversed and remanded the district court's decision denying benefits, finding that it was unclear from the ALJ's restriction to "routine, repetitive tasks with simple instructions" whether the VE properly was informed of and accounted for limitations in "concentration, persistence and pace." *O'Connor-Spinner*, 627 F.3d at 620-21.

The cases relied upon by Wynstra are not on point as neither of them holds that a lapse on the part of the ALJ in framing the hypothetical must result in a remand. Noteworthy, in *O'Connor-Spinner*, the Seventh Circuit explained that it does not insist on a *per se* requirement that the specific terminology "concentration, persistence and pace" be used in the ALJ's hypothetical to the VE in all cases. *O'Connor-Spinner*, 627 F.3d at 619. Additionally, the instant facts are distinguishable from the cases relied upon by Wynstra. Here, the medical consultant who reported Wynstra's limitations in concentration, persistence, and pace effectively translated his opinion regarding those limitations into an RFC assessment. The ALJ then adopted the RFC of that consultant and incorporated that RFC into his hypothetical to the VE.

23

Accordingly, this case is more akin to those cases relied upon by the Commissioner. In ***Johansen v. Barnhart***, 314 F.3d 283 (7th Cir. 2002), the Seventh Circuit let stand a hypothetical that omitted the terms "concentration, persistence and pace" when the ALJ relied on a consultative doctor's findings that had been translated into a specific RFC assessment. ***Johansen***, 314 F.3d at 289. Similarly, in ***Milliken v. Astrue***, 397 Fed.Appx. 218 (7th Cir. 2010), the Seventh Circuit found that the ALJ adequately accounted for the claimant's limitations in concentration, persistence, and pace in his hypothetical to the VE because it incorporated the state's testifying expert's assessment that the claimant could perform unskilled work despite her mental limitations. ***Milliken***, 397 Fed.Appx. at 222.

Here, in formulating the hypothetical to the VE, the ALJ incorporated all of the restrictions contained in his RFC for Wynstra.  In developing his RFC, the ALJ relied upon consulting physician, Dr. Kladder's opinion.[1] Dr. Kladder completed a mental residual functional capacity assessment of Wynstra and translated his findings of Wynstra's limitations into a specific RFC that concluded she could perform simple, repetitive tasks.  The ALJ adopted Dr. Kladder's conclusion in formulating his RFC and included all of the restrictions contained in his RFC in the

---

[1] It is important to note that it is Dr. Kladder's assessment of Wynstra's deficiencies in concentration, persistence, and pace that she complains was not sufficiently included in the hypothetical to the VE.

24

hypothetical to the VE. Thus, there was substantial evidence to support the specific RFC determination made by the ALJ in this case and that RFC was properly incorporated into the hypothetical to the VE. *See **Meredith v. Bowen***, 833 F.2d 650, 654 (7th Cir. 1987) ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record."). Therefore, despite the omission of the specific terms "concentration, persistence, or pace", this court finds that the hypothetical, as presented to the VE, was proper.

Wynstra next contends that the ALJ's failure to give appropriate weight to the opinions of her treating psychiatrist and physician was unsupported by and contrary to the evidence of record. A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable and clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §404.1527(d)(2). *See also **Schmidt v. Astrue***, 496 F.3d 833, 842 (7th Cir. 2007); ***Gudgell v. Barnhart***, 345 F.3d 467, 470 (7th Cir. 2003). The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." ***Clifford v. Apfel***, 227 F.3d 863, 870 (7th Cir. 2000) (*quoting **Scivally v. Sullivan***, 966 F.2d 1070, 1076 (7th Cir. 1992)). *See also* 20 C.F.R. §404.1527(d)(2) ("We will always give good reasons

25

in our notice of determination or decision for the weight we give your treating source's opinion.").

Controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony. ***Schmidt***, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for revising or rejecting evidence of disability."). *See e.g.*, ***Latkowski v. Barnhart***, 93 Fed.Appx. 963, 970-71 (7th Cir. 2004); ***Jacoby v. Barnhart***, 93 Fed.Appx. 939, 942 (7th Cir. 2004). Once well-supported, contradictory evidence is introduced, the treating physician's opinion no longer is controlling, but remains a piece of evidence for the ALJ to weigh. ***Hofslien v. Barnhart***, 439 F.3d 375, 377 (7th Cir. 2006). Ultimately, the weight accorded to a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician also may "bend over backwards to assist a patient in obtaining benefits . . . [and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disabil-

26

ity case usually are." *Hofslien*, 439 F.3d at 377 (internal citations omitted).

Here, substantial evidence supports the ALJ's decision to give "little, if any weight" to the opinion of Wynstra's treating physician, Dr. Kelly. As the ALJ explained, Dr. Kelly's opinion, as stated in his Medical Source Statement, was "incredible on its face" and "not corroborated by his own records or those of any other treating source." Indeed, Dr. Kelly's MSS questionnaire did not indicate any specific limitation, nor did it state any basis for his opinion. Instead, it merely indicated that Wynstra was "limited" or noted that she "can't do" every activity listed on the questionnaire, including "hearing," "seeing," and "speaking." There is no evidence in the record to support such broad limitations, nor did Wynstra herself testify to such broad limitations. As the record stands, the ALJ's conclusion to give little weight to the opinions of Dr. Kelly was proper. *See e.g.*, *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (affirming an ALJ's decision not to give controlling weight to a treating physician who gave blanket opinions as to the severity of claimant's impairments as well as her ability to work without elaborating on the basis for that opinion).

Wynstra's assertion regarding the opinions of her "treating psychiatrist" is problematic on its face. In her brief, Wynstra uses both the terms "treating psychiatrist" and "treating thera-

pist" to describe the opinions of social worker David Johnson. Wynstra asserts only that "the ALJ does not even mention the mental RFC provided by Ms. Wynstra's treating therapist" and cites to "37F" which is the portion of the record containing Johnson's records from the Swanson Center.  Wynstra has provided no analysis for this claim, and as such, this court need not address it.  *See* **Gold v. Wolpert**, 876 F.2d 1327, 1332 (7th Cir. 1989) ("perfunctory and underdeveloped assertions" are not arguments, and need not be considered).

Nevertheless, a licensed clinical social worker such as Johnson is not an acceptable medical source and his opinions are not entitled to the controlling weight as Wynstra suggests.  *See*, SSR 06-03p ("Medical sources who are not 'acceptable medical sources,' [include, for example] licensed clinical medical workers . . .") Additionally, the ALJ did address Wynstra's records from the Swanson Center in his decision.  On page 8 of his decision, the ALJ explained that Johnson's assessment of Wynstra's behavioral areas were not inconsistent with the State Agency's assessment of her ability to do simple, repetitive tasks.  Accordingly, Wynstra's assertion that the ALJ did not give appropriate weight to the opinions of Johnson fails.

Finally, Wynstra complains that the ALJ erred in his credibility determination of both herself and her neighbor.  Specifically, Wynstra claims that the ALJ failed to support his findings

28

with a sufficient explanation and evidence from the record and failed to consider the combined effects of Wynstra's physical and mental impairments when evaluating her credibility.[2]

This court will sustain the ALJ's credibility determinations unless they are "patently wrong" and not supported by the record. *Schmidt*, 496 F.3d at 843; *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele*, 290 F.3d at 942. Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

---

[2] Although Wynstra additionally spends some time articulating the Seventh Circuit's distaste for the use of boilerplate language, she ultimately concludes that, "[i]t is not the ALJ's use of boilerplate language that makes his credibility determination invalid." Accordingly, this court will not address the ALJ's use of boilerplate language, if any, here.

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, he must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *2. *See **Zurawski v. Halter**, 245 F.3d 881, 887 (7th Cir. 2001); **Diaz v. Chater**, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). He must "build an accurate and logical bridge from the evidence to [his] conclusion." **Zurawski**, 245 F.3d at 887 (*quoting* **Clifford**, 227 F.3d at 872).

Wynstra argues that the ALJ's credibility determination is flawed because he failed to support it with a sufficient explanation and evidence from the record. Wynstra goes on to assert that the logical bridge requirement in determining the credibility of the witnesses was not met because the ALJ failed "to evaluate the connection between Ms. Wynstra's pain and [her] depression." (Pltf. Br. p. 19)

In her brief, Wynstra contends that "it is well known that depression magnifies pain and vice versa," (Pltf. Br. p. 19) and cites to *Ostrowski v. Heckler*, 609 F.Supp. 1109, 1118 (N.D. Ill 1985), to support her proposition that the ALJ should have found that her depression exacerbated her physical limitations to the extreme extent of her testimony. Wynstra argues that the *Ostrowski* court held that the claimant's "back condition might exacerbate his mental impairment and vice versa . . . [T]here appears to be a feedback between [claimant's] two impairments, which the ALJ should consider on remand." *Ostrowski*, 609 F.Supp. at 1118. However, Wynstra has confused the holding of the *Ostrowski* court with its findings. The *Ostrowski* court explained that under the Disability Reform Act, the mental and physical impairments had to be considered in combination, even if they were unrelated and one or both were not severe.  However, the district court did not hold, as Wynstra contends, that depression magnifies pain and demands a finding of disability.

Wynstra's complaint that the ALJ did not consider the combination of her mental and physical impairments is incorrect. The ALJ stated that he considered both her physical and mental impairments in rendering his decision, and he went into a detailed analysis of the medical records, including the reports and assessments that considered Wynstra's physical and mental impairments in combination.  *See* Tr. 20, 21, 23.  The ALJ explained the

31

effect that Wynstra's mental impairments had on her ability to concentrate, mood, and orientation. The record clearly reflects that the ALJ reviewed and considered both Wynstra's physical and mental impairments in rendering his opinion. More convincingly, Wynstra, who carries the burden to show that she is disabled at steps one through four, has pointed to no evidence to support her assertion that, because of her depression, her pain and physical limitations rose to the level described in her testimony. *See* 20 C.F.R. §404.1520(a)(4)(i)-(iv).

The important consideration at this stage is whether the ALJ adequately built the required "logical bridge" to his conclusion that the testimony of both Wynstra and her neighbor was, to some extent, not credible. The "logical bridge" requirement does not specify what or how much the ALJ must say but merely recognizes the obligation of the ALJ to "rationally articulate the grounds for [his] decision . . ." ***Steele***, 290 F.3d at 941.  In his decision, the ALJ explained his credibility determination first by discussing the lack of corroboration between Wynstra's claimed limitations as testified to by both Wynstra and her witness, and the evidence contained within Wynstra's medical records. The ALJ noted the absence of any objective medical evidence to support Wynstra's testimony that she could lift only "a pound or two." The ALJ went on to point out that the state agency medical evaluations concluded that Wynstra was capable of light work, and

32

the record is devoid of any evidence of ongoing problems with manipulation since her wrist fractures and fall from the pickup truck.

Finally, the ALJ did not completely discount the testimony of Wynstra and her neighbor.  He explained that, although the State Agency doctors concluded that she was capable of light work with some environmental limitations due to the Raynaud's Syndrome, he found that the record as a whole supported the testimony regarding Wynstra's ankle and foot problems and thus assigned an RFC limiting her to sedentary work. Because the ALJ's credibility determination was articulated and supported by substantial evidence, as described above, the logical bridge requirement has been met and it cannot be found to be in error.

_____

Based on the foregoing reasons, the decision of the Commissioner of Social Security is **AFFIRMED.**

ENTERED this 12th day of February, 2013

                              s/ ANDREW P. RODOVICH
                                 United States Magistrate Judge